U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 MAY -2 PM 12:38

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| MEGAN THOMPSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:23-cv-2 |
| ) | |
| STRYKER EMPLOYMENT COMPANY, ) | |
| LLC, ) | |
| ) | |
| Defendant. ) | |

## ORDER ON ATTORNEY FEE DISPUTE

On January 4, 2023, Plaintiff Megan Thompson filed this lawsuit alleging wrongful termination of employment by Defendant Stryker Employment Co., LLC. (Doc. 1.) She was represented by attorney Norman Watts. Ms. Thompson and her attorney entered into a contingent fee agreement on March 26, 2023.[1] (Doc. 97-3.) Following settlement of the case with Stryker in 2024, a dispute arose between Ms. Thompson and Mr. Watts over whether Mr. Watts is entitled to receive a one-third contingent fee. The court retained jurisdiction over the fee dispute and allowed Mr. Watts to intervene. (Doc. 63.) Both parties have filed memoranda and exhibits documenting their positions. Neither side seeks to present testimony. Instead, they seek a ruling from the court on the merits of the dispute based on their exhibits and briefing.

### Findings of Fact

On the basis of the parties' submissions, including their exhibits, the court finds as follows:

---

[1] The March 26 agreement replaces an earlier agreement providing for representation on an hourly basis. (Doc. 97-4.)

### Retention of Mr. Watts as Ms. Thompson's Attorney

In 2018 Ms. Thompson went to work for Stryker in the field of medical sales. (Doc. 11-1 ¶ 6.) Her employment ended in February 2022. (*Id.* ¶ 45.) Ms. Thompson and Stryker disagree about why she was terminated.

In January 2022, Ms. Thompson met with Attorney Norman Watts and his legal assistant to discuss potential claims of gender discrimination and sexual harassment at work. On February 9, 2022, Ms. Thompson signed a fee agreement. The agreement offered her the choice of a one-third contingent fee (plus expenses) or an hourly rate of $350. She chose the hourly rate. (Doc. 97-4.)

On January 4, 2023, Mr. Watts filed a lawsuit against Stryker in the District of Vermont. (*See* Doc. 1.) The complaint alleges claims of gender discrimination and retaliation for complaints about alleged sexist behavior by co-workers, both in violation of the Vermont Fair Employment Practices Act, 21 V.S.A. § 495 et seq. (*Id.*) In response, Stryker accused Ms. Thompson of "job abandonment after she stopped working and failed to respond to multiple communications from Stryker." (Doc. 97-2 at 2.)

On March 26, 2023, Ms. Thompson and Mr. Watts entered into a contingent fee agreement. (Doc. 97-3.) The agreement appears in the same letter form as their prior hourly agreement. It describes a choice between an hourly fee of $350 per hour or a one-third contingent fee. Under either arrangement, the client remained responsible for paying litigation expenses on a monthly basis. Ms. Thompson selected the one-third contingent fee. The fee agreement contains a termination clause:

> Either of us may terminate this Agreement unless judgment has been rendered or a settlement has been achieved. In those instances, this Agreement and the <u>fee arrangements are binding</u>. Otherwise, if termination occurs before a judgment or settlement, you must pay for the services provided up to the point of termination,

> at our standard hourly rate, currently-owed expense reimbursements and pay for extra services and/or expenses required to transfer the matter to another attorney or back to you if you choose to pursue the matter *pro se*.

(Doc. 97-3 at 2 (emphasis in original).)

In June 2023, the parties submitted a stipulated discovery schedule providing for the completion of discovery by December 8, 2023. (Doc. 17.) It set November 15, 2023, as the date for early neutral evaluation. Early neutral evaluation ("ENE") is a mandatory settlement process governed by Local Rule 16.1. In many cases, the parties select an evaluator to serve as mediator. In this case, the parties chose attorney Jim Spink, an experienced Vermont mediator.

On September 2, 2023, Attorney Watts filed discovery certificates stating that he had served responses to Stryker's discovery on opposing counsel. (Doc. 22.) On September 5, 2023, Ms. Thompson emailed Mr. Watts to ask when she could review Stryker's responses to discovery. (Doc. 100-1.) Mr. Watts responded that he had held off serving discovery requests of his own because Stryker would provide documents at the mediation. (Doc. 100-1.)

The parties met with Mr. Spink on September 7, 2023. His report states that the session did not result in a settlement. (Doc. 24.)

In the days following the mediation, Ms. Thompson asked Mr. Watts to provide a statement of his hours and expenses. She expressed concern about outstanding hourly fees and expenses and her ability to pay the expenses if she did not prevail in the lawsuit. (Doc. 91-2.) In response, Mr. Watts provided a statement showing 32.1 hours of attorney time for a total of $11,253 at $350 per hour. (Doc. 91-4.) The statement contains a major error. The actual total for the itemized tasks is 16.9 hours—reducing the total hourly charges as of September 2023 to $5,915.

On September 15, 2023, the parties sought to extend discovery through January 8, 2024. (Doc. 25.) Mr. Watts continued to represent Ms. Thompson.

On November 8, 2023, the court granted Ms. Thompson's motion to stay discovery while she prepared to begin a new job. The court stayed discovery until January 10, 2024. (Doc. 37.) On January 25, 2024, the court granted Stryker's motion to compel discovery and allowed Ms. Thompson 30 days to comply. (Doc. 39.)

On March 1, 2024, Mr. Watts, acting with his client's authority, offered to settle the case for $290,000. His email stated that the offer was good for one week. (Doc. 91-20.)

On March 2, 2024, Ms. Thompson sent Mr. Watts an email identifying the billing error in the September 2023 statement. She raised concerns about the cost of the mediation and requested monthly statements with receipts. She requested a pause in obtaining witness statements or conducting depositions. She gave Mr. Watts the following instruction concerning her settlement proposal:

> If you haven't already offered a $290K settlement, I would prefer that you hold off on that please do not. When I told you $300K in mediation was my bottom floor, I meant it. From a strategic standpoint, I don't think it was a good idea to start by telling Stryker my floor because now I'm stuck looking stubborn. I wish we had gone in high so we could negotiate down. Regardless, please do not do any further settlement negotiation until you complete a billing review.

(Doc. 91-21.) [2]

---

[2] In their pleadings, the parties have redacted the actual amount of the settlement through sealing authorized by the court. The court has considered whether it can fully explain the reasons for its ruling without disclosing this figure and the details of the parties' negotiations. It cannot. In the court's view, the amount of the demand and Stryker's agreement to pay it are important factors in determining whether Stryker and Ms. Thompson settled the case before Ms. Thompson discharged Mr. Watts and whether Ms. Thompson suffered injury through her attorney's actions. These factors weigh heavily in the court's ruling. The strong presumption of public access to judicial records requires the court to provide an unredacted and complete account of the events leading to the settlement and subsequent fee dispute. *See Nixon v. Warner*

The one-week period of the offer expired on March 9, 2024. On March 8, 2024, Stryker's attorney responded to Mr. Watts that she was "working on this but the person I need for a final approval is out until Tuesday [March 12]. Is it possible to get an extension until the end of the day on Tuesday?" (Doc. 91-20.) Mr. Watts responded, "Sure, no problem. Thank you for letting me know." (Doc. 91-22.)

In an affidavit dated January 17, 2025, Ms. Thompson states that she did not authorize keeping the offer open for a week or extending the time to respond by four days to March 12. (Doc. 91-18 ¶ 9.)

On March 11, 2024, Stryker agreed to pay $290,000 to settle the case. The email accepting the offer included five conditions:

- Execution of a general release of any and all claims by Ms. Thompson against Stryker and "its officers, directors, employees, affiliates, etc.";

- Dismissal of the pending lawsuit with prejudice;

- Confidentiality;

- No reemployment of Ms. Thompson by Stryker;

- Non-disparagement by Ms. Thompson.

(Doc. 91-23). On the same day, Mr. Watts advised his client of the settlement by text:

> Mr. Watts: Pursuant to our negotiations, Stryker accepts our demand to settle the case @ 290,000. The acceptance thus establishes a binding agreement that will be memorialized in a standard settlement agreement. Congratulation. The battle is over. Payment in a few weeks.
>
> Ms. Thompson: Wow, that really surprises me and that is great news. Is there a way we can specify how the settlement is paid?

---

*Communications, Inc.*, 435 U.S. 589 (1978); *United States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995).

5

> Mr. Watts: Surprised me too. We have some ability to request how payment is arranged. What did you have in mind?
>
> Ms. Thompson: Well, I'm trying to not get killed with taxes. Additionally, I wonder if they'd be willing to provide some of the amount in stock or if that's even allowed. I used to have a discount on company stock and it was my nest egg, but I've had to sell a lot of it over the past couple years because of the job loss.
>
> Mr. Watts: Defendants withhold wages @ your % and distribute the balance. We can request that the legal fees be paid directly so you won't pay taxes on them. We might be able to apportion part of the balance to emotional distress rather than wages. These methods are customary & usually acceptable to limit tax exposure.
>
> The stock arrangement is irregular but we can request it. Their decision.
>
> You certainly punished Stryker -- $290k + another $100k + for their 2 law firms & 4-5 lawyers.

(Doc. 71-4.)

On May 9, 2024, Ms. Thompson sent Mr. Watts an email terminating their professional relationship. She requested that he withdraw from the case and place her in direct communication with Stryker until she could retain a new attorney. (Doc. 91-25.) Mr. Watts complied with her request. Ms. Thompson represented herself in this litigation until her present attorney, Ian Carleton, entered his appearance on November 18, 2024. (Doc. 82.)

On May 16, 2024, Stryker filed a motion to enforce settlement. (Doc. 40.) The moving papers alleged that the parties had agreed upon settlement terms on the basis of an email exchange between Stryker and Mr. Watts. At the parties' joint request, the court postponed a hearing on the motion. (Doc. 47.)

On May 17, 2024, Ms. Thompson entered a notice of pro se representation. (Doc. 41.) On May 27, 2024, Mr. Watts filed a motion to withdraw as plaintiff's counsel. (Doc. 44.)

On June 16, 2024, Mr. Watts filed notice of a UCC lien against the proposed settlement. (Doc. 48.)

6

Following a disciplinary proceeding before a hearing panel of the Vermont Professional Responsibility Board and an appeal to the Vermont Supreme Court, Mr. Watts received a two-year suspension from practice, effective in August 2024. *In Re Watts*, 2024 VT 48. The disciplinary proceeding did not concern his representation of Ms. Thompson in this case.

In the months following Mr. Watts' termination as counsel, Ms. Thompson, representing herself, negotiated a final settlement with Stryker. (Doc. 70; Doc. 91-29.) She signed the settlement agreement on September 27, 2024. The terms are very similar to those negotiated by Mr. Watts on Ms. Thompson's behalf in March 2024:

- A total settlement amount unchanged at $290,000;
- An escrow arrangement to hold sufficient funds to pay Mr. Watts' one-third contingent fee and expenses ($96,666) if he succeeds in this fee dispute or to pay these amounts to Ms. Thompson if she prevails;
- A provision providing that, upon delivery of the settlement documents, Ms. Thompson will receive $106,334 for lost wages (reduced by withholding for taxes) and $87,000 for emotional damages;
- A confidentiality agreement modified to allow Ms. Thompson to discuss the settlement with certain professionals such as lawyers and tax preparers, her therapist and medical providers, and three family members or friends identified in the agreement;
- A non-disparagement clause as well as various standard settlement provisions such as a "no admission of wrongdoing" term applicable to both sides; and
- Dismissal of this lawsuit with prejudice.

(Doc. 97-15.)

On November 18, 2024, attorney Ian Carleton entered his appearance for the limited purpose of representing Ms. Thompson in the fee dispute. (Doc. 82.)

## Conclusions of Law

### A. Jurisdiction, procedural posture, and burden of proof

The district court may exercise supplemental jurisdiction over attorneys' fee disputes following resolution of the principal claim. *In re Austrian and German Bank Holocaust Litigation*, 317 F.3d 91, 98 (2d Cir. 2003) ("Whenever a district court has federal jurisdiction over a case, it retains ancillary jurisdiction after dismissal to adjudicate collateral matters such as attorney's fees."); Wright and Miller, *Federal Practice and Procedure* § 3523.2 (2024). Pursuant to F. R. Civ. P. 24, the court granted Mr. Watts' motion for permissive intervention for the purpose of asserting his claim for a legal fee. (Doc. 63.) As the party asserting a claim, Mr. Watts has the burden of proof by a preponderance of the evidence. *Young v. N. Terminals, Inc.*, 132 Vt. 125, 130 (1974).

### B. What law governs?

This is a dispute between a resident of Maine and her Vermont attorney concerning her representation in a lawsuit filed in U.S. District Court for the District of Vermont. It is governed by Vermont law, including the Vermont Rules of Professional Conduct, and the decisions of the Vermont Supreme Court.

### C. Did the parties form a valid contingency fee agreement?

Vermont Rule of Professional Conduct 1.5(c) sets requirements for contingency fee agreements more stringent than those for other fee arrangements:

> [All contingency fee agreements] shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal;

8

litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated.

The agreement must also notify the client of "any expenses for which the client will be liable whether or not the client is the prevailing party."[3]

The written fee agreement dated March 26, 2023, meets these disclosure requirements. (Doc. 97-3.) The contingent fee is calculated as "1/3 of the proceeds of the lawsuit, whether by settlement or jury verdict, at the end of the process." (*Id.*)  Ms. Thompson remains responsible for litigation expenses, "paid monthly as incurred." (*Id.*) The agreement requires Mr. Watts to "notify [the client] prior to committing to exceptional expenses such as an expert witness or travel." (*Id.*) It allows for reimbursement for such expenses to "be spread out over the course of the lawsuit, usually a year." (*Id.*)

In addition to the requirements of Rule 1.5(c), a contingency fee—like any other fee agreement—must be "reasonable" both at the outset of the case and when it is applied at the conclusion. Restatement (Third) of the Law Governing Lawyers § 34, cmt. c ("Although reasonableness is usually assessed as of the time the contract was entered into, later events might be relevant."). Because the attorney accepts the risk that they will not be paid in the event of a loss, "[a] contingency fee charged in any given winning case is likely to be high in relation to the hours actually spent on the case by the lawyer." *Fields v. Kijakazi*, 24 F.4th 845 (2d Cir. 2022).

The amount of the contingency percentage—one-third—is within the range of percentage fees consistently accepted by lawyers and courts as reasonable. *See Matter of Cont'l Ill. Sec.*

---

[3] The Vermont Rules of Professional Conduct, adopted in 1999, follow the American Bar Association Model Rules of Professional Conduct and replace the prior Vermont Code of Professional Responsibility, which itself followed the prior ABA Model Code.

9

*Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) (Posner, J.) ("We know that in personal-injury suits the usual range for contingent fees is between 33 and 50 percent . . . .").

The court concludes that the contingency fee agreement meets the requirements of Vermont Rules of Professional Conduct and is an enforceable contract.

> **D.  Did Ms. Thompson exercise her option to withdraw from the representation and the fee agreement prior to the date when "a settlement has been achieved" within the meaning of the contingency fee agreement?**

There is no dispute that on May 9, 2024, Ms. Thompson sent Mr. Watts an email terminating his employment. (Doc. 91-25.) The fee agreement is terminable by either party without explanation "unless judgment has been rendered or a settlement has been achieved." (Doc. 97-3.) The principal issue in this fee dispute is whether the negotiations between Ms. Thompson and Stryker had reached the point of "achieving" a settlement. Mr. Watts contends that settlement was achieved when Stryker agreed to the $290,000 demand; Ms. Thompson points to additional terms on which she did not agree until months after her termination of Mr. Watts.

The leading Vermont Supreme Court cases concerning the enforcement of preliminary agreements to settle are *Catamount Slate Prods., Inc. v. Sheldon*, 2003 VT 112, 176 Vt. 158, 845 A.2d 324 and *Miller v. Flegenheimer*, 2016 VT 125, 203 Vt. 620, 161 A.3d 524. *Catamount Slate* follows the decision of the Second Circuit in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir. 1986), in identifying four factors governing the enforceability of a preliminary agreement:

- An express reservation of the right not to be bound in the absence of a writing;
- Partial performance;
- Whether all of the terms of the alleged contract have been agreed upon; and

10

- Whether the agreement at issue is the type of contract that is usually committed to writing.

*Miller v. Flegenheimer* extends these principles beyond the oral settlement terms at mediation to the exchange of contract terms by email in a negotiation between the buyer and seller of a business. In both cases, the Vermont Supreme Court recognized that the inquiry is objective and "depends on two factors: the parties' intent to be bound and the definiteness of terms in the communications between the parties." *Miller*, 2016 VT at ¶ 13..

### 1. No express reservation of rights

In this case, there was no express reservation of the right not to be bound in the absence of a writing. After reaching an agreement on the amount of the settlement, Mr. Watts and Stryker's attorney recognized the need for additional terms. Stryker's attorney's email set out five additional conditions and ended "[w]e are preparing the settlement agreement and will sen[d] it to you this week." (Doc. 91-23.) Mr. Watts replied, "Thank you very much, Cheryl. Your efforts to settle the case are greatly appreciated. I will confer with Ms. Thompson about the specifics of the Stryker offer and respond back to you asap." (*Id.*) Neither attorney included an express reservation of right not to be bound. Both, however, recognized that there were additional terms to consider, and Mr. Watts characterized Stryker's email as an "offer."

### 2. No partial performance

Neither side asserts that there was partial performance of the settlement agreement prior to the final written agreement signed by Ms. Thompson and Stryker on September 27, 2024, and October 10, 2024, respectively. (Doc. 97-15.)

11

### 3. Whether all terms of the alleged contract were agreed upon

This factor is the critical one in this case. Mr. Watts contends that the final agreement was no different in substance from the original agreement proposed by Stryker. Ms. Thompson points to differences including changes in the confidentiality provisions that were important to her.

The email communications among the parties demonstrates that prior to Mr. Watts' termination on May 9, 2024, Ms. Thompson and Stryker reached an agreement only on the amount of the settlement. On March 21, 2024, Stryker's counsel supplied a proposed settlement agreement. (Doc. 97-14 at 11.) Mr. Watts forwarded it to Ms. Thompson with a cover note stating "Attached, for your review – we can discuss at your convenience." (*Id.* at 12.) There is no evidence that Ms. Thompson accepted the full agreement. Instead, by May 24, 2024, she sought to revoke her agreement to the settlement altogether unless Stryker agreed to remove the confidentiality requirement or pay an increased amount. (Doc. 91-26.)

### 4. Whether the agreement is of the type generally committed to writing

This factor is not relevant since the negotiations proceeded in writing by email.

The court concludes that final settlement was *not* achieved before Mr. Watts' termination. The most relevant factor is whether all terms of the settlement were agreed to before he left the case. Although the amount of the settlement remained the same, Ms. Thompson negotiated additional material terms after Mr. Watts' departure. These included changes to the confidentiality requirement permitting her to discuss the settlement with a list of people close to

her and a $5,000 adjustment of the allocation of the settlement between lost income and emotional distress. (Doc. 97-16.)[4]

### 5.     What does Ms. Thompson owe based upon an hourly rate?

The consequence of the court's conclusion that the settlement was not achieved is that Ms. Thompson owes Mr. Watts payment of the hourly rate (plus expenses) under the termination clause of their fee agreement. At the court's request, Mr. Watts has supplied a statement showing 32.1 hours of attorney time. At $350 per hour, Ms. Thompson owes him a fee of $11,235 plus out of pocket expenses of $1,251.56.

Ms. Thompson has responded by expressing doubts about many of the time entries and identifying minor computational errors. Her response comes in the form of a memorandum from her attorney. She has not supplied any evidence of her own and does not propose an alternative hourly figure. Both sides have declined the opportunity to take part in an evidentiary hearing. Ms. Thompson's attorney concludes the memorandum with an expression of suspicion about errors and discrepancies in Mr. Watts' statement coupled with a request for "an order enabling [Ms. Thompson] to pay Mr. Watts a reasonable hourly rate for his services and be done with him." (Doc. 106 at 5.)

The court has reviewed Mr. Watts' statement. It is the only available evidence about the services he provided. None of the entries on their face are unusual or unreasonable. Some were added after the original statement was provided to Ms. Thompson; others may be inconsistent

---

[4] The court does not consider the escrow arrangement requiring the disputed amount of the legal fee to be held pending resolution of the fee dispute to be a material change to the settlement terms between Stryker and Ms. Thompson. The escrow agreement is obviously a feature of the final settlement agreement not originally contemplated by the parties, but it was negotiated solely in response to Mr. Watts' termination. It does not alter the obligations of Stryker and Ms. Thompson to one another.

with her own phone records. But there is no *evidence* before the court that they are mistaken or false. The total time spent to achieve a substantial settlement in a contested case is not excessive. The out-of-pocket expenses consist of the filing fee (miscalculated at $205 instead of $402); cost of service; and the amount paid to the early neutral evaluator. In the absence of evidence or testimony to the contrary, the court concludes that Mr. Watts has proved the amount of his hourly charges and expenses by a preponderance of the evidence. Payment of these amounts fulfills Ms. Thompson's obligation under the fee agreement.

> E. **Is Ms. Thompson excused altogether from payment due to a breach of the fee agreement by Mr. Watts?**

Fee agreements are contracts of a special kind. Because attorneys are subject to the Rules of Professional Conduct, their right to payment is subject to ethical standards that supplement the terms of a fee agreement. A lawyer who violates ethical standards is not generally entitled to payment. Section 37 of the Restatement (Third) of the Law Governing Lawyers provides guidance for determining whether misconduct warrants forfeiture of part or all of the attorney's compensation:

> A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation in the matter. Considerations relevant to the question of forfeiture include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies.

Under § 37, "[a] lawyer is not entitled to be paid for services rendered in violation of the lawyer's duty to a client or for services needed to alleviate the consequences of the lawyer's misconduct." *Id.* at cmt. a.

The factors identified in section 37 are consistent with principles of material breach that appear more generally in Vermont case law. "To support a judgment of forfeiture, the breach complained of may not be trivial or technical." *Champlain Oil Co. v. Trombley,*

14

144 Vt. 291, 297 (1984). A finding of materiality depends on evidence that "an injured party has sustained a substantial injury by the breach." *Brady v. CU York Ins. Co.*, No. 2005-323, 2006 WL 5866264 (Vt. Mar. 1, 2006) (citation omitted). The court follows the *Brady* decision in applying five factors identified in Restatement (Second) of Contracts § 241 (1981) that bear on the issue of materiality. Of these five factors, the most important in this case is whether Ms. Thompson suffered any injury through Mr. Watts' actions.

### 1. Alleged violations of attorney ethics

In this case, Ms. Thompson identifies four actions by Mr. Watts that she identifies as violations of his ethical obligations: providing an incorrect total number of hours worked as of September 18, 2023; extending the time for Stryker to settle by four days without client authority; agreeing to settle the case without Ms. Stryker's consent; and describing the settlement as "binding." (Doc. 91.)

#### a. The accounting error

The court notes at the outset that the accounting mistake is serious. Mr. Watts was subject at all times to a professional obligation to "promptly comply with reasonable requests for information." VRP 1.4(a)(4). In September 2023, Ms. Thompson asked for a summary of time and expenses in order to know the cost then of terminating Mr. Watts as her attorney. The response she received contained a significant mathematical error. There is no evidence before the court that the error was intentional. As Ms. Thompson discovered when she reexamined the email on March 2, 2024, the numbers simply do not add up.

In considering whether the accounting mistake relieves Ms. Thompson of the obligation to pay her lawyer any fee, the court starts with the premise that Mr. Watts had a duty to provide accurate information about his time and expenses and that he failed to do so on September 23,

15

2023. The issue is one of materiality: whether the mistake caused injury to Ms. Thompson sufficient to forfeit his right to payment under the fee agreement.

The injury that Ms. Thompson identifies is that if Mr. Watts had provided an accurate statement of his hours when he asked for it in September 2023, she could have paid him for his time ($5,915 plus expenses of $1,485) and hired a different attorney. In her affidavit dated January 17, 2025, she states that "the amount of this statement was the reason I did not fire him." (Doc. 91-3.) Instead, she continued with his representation, incurring an additional $5,320 in time charges.

In light of the court's decision that she was entitled to terminate his services effective May 2024, Ms. Thompson suffered no loss by terminating Mr. Watts in May 2024 instead of September 2023. On March 1, 2024, she authorized Mr. Watts to settle her case for $290,000. This figure was acceptable to her, even knowing that she had signed a one-third contingency fee agreement. To the surprise of Mr. Watts and Ms. Thompson, on March 11, 2024, Stryker agreed to pay the amount of the settlement demand in full. There is no evidence that she could have obtained Stryker's offer if she had represented herself or that another attorney could have improved on it. Instead, the evidence shows that in exchange for the relatively modest additional hourly charges of $5,320, Mr. Watts obtained the "bottom line" offer that Ms. Thompson desired.

### b.     The four-day extension

Ms. Thompson charges Mr. Watts with violating his professional duty to her by extending Stryker's time to respond to the offer by four days (March 8 to March 12, including an intervening weekend). There is no evidence that Mr. Watts obtained her consent to the extension. Since Ms. Thompson had already expressed reluctance to settle the case for $290,000

16

in her email to Mr. Watts on March 2, 2024, the appropriate course for a lawyer would have been to speak with his client about extending the settlement offer by four more days. Instead, Mr. Watts granted Stryker's request without his client's consent.

The issue for the court is whether the unauthorized extension of Stryker's time to respond caused injury to Ms. Thompson. Far from being injured by the extension, Ms. Thompson received word that Stryker would pay the entire sum she requested in her settlement demand. Her text messages to Mr. Watts on March 11 show her approval of the settlement at $290,000 and her interest in the additional details of tax treatment and the manner of payment. She expressed no desire to withdraw her settlement demand or in some other way alter the agreement reached by the parties on the amount of the settlement.

On these facts, Mr. Watts has caused no injury to Ms. Thompson by allowing Stryker four more days to respond to her settlement demand. He communicated the settlement demand she authorized, he relayed its acceptance to her and heard her acknowledge it as "great news," and he worked with her until she terminated his services to resolve the details such as manner of payment, tax treatment, and confidentiality.

    c.    **Agreeing to settle without consent**

Ms. Thompson's email dated March 2, 2024, ordered Mr. Watts to make no offer to settle unless he has already done so. Instead of taking steps to withdraw the settlement demand, he extended Stryker's time to respond   Because the extension was unauthorized, there is a reasonable argument that Stryker's acceptance came too late and did not bind either party. There is no need to resolve this issue because Ms. Thompson removed any doubt about her intent to settle the case for $290,000 by her enthusiastic response to word of Stryker's offer. Whether Stryker accepted her demand or she accepted Stryker's offer, her text exchange with her attorney is clear evidence

of her intent to enter into a settlement at the agreed figure. The short extension caused her no injury because she clearly expressed her desire to settle at the $290,000 figure.

### d.    Describing the settlement as "binding"

On March 11, 2024, Mr. Watts informed Ms. Thompson about Stryker's acceptance of her settlement demand. His text message reads:

> Pursuant to our negotiations, Stryker accepts our demand to settle the case @ $290,000. The acceptance thus establishes a binding agreement that will be memorialized in a standard settlement agreement. Congratulation. The battle is over. Payment in a few weeks.

(Doc. 91-24.) Ms. Thompson now takes issue with the use of the word "binding" since she may have been able to undo the settlement even after Stryker's acceptance.

In light of the *Catamount Slate* and *Miller v. Flegenheimer* decisions, it was an exaggeration for Mr. Watts to describe the agreement on a payment of $290,000 as "binding." With the benefit of hindsight, it would be more accurate to describe the enforceability of the settlement after Stryker agreed to pay $290,000 as open to debate. Certainly Stryker saw the agreement as binding because the company later filed a motion to enforce it. In her responses to Stryker's motion, Ms. Thompson has not sought to withdraw from the agreement or to return to litigation of her underlying claims. Instead, her attention has been on negotiating the remaining terms of the settlement agreement and, more recently, resolving the attorneys fee dispute. Her position did not change after she retained replacement counsel who also has not sought to withdraw from the proposed settlement. The court sees no injury to Ms. Thompson through Mr. Watts' characterization of the settlement amount as "binding" because she herself has never requested that the court undo the parties' agreement on the $290,000 figure.

### 2. Forfeiture to Mr. Watts

If the four issues identified by Ms. Thompson are considered material breaches of the contract between Ms. Thompson and Mr. Watts, Mr. Watts will lose the benefit of the fee agreement. He will have represented Ms. Thompson for more than a year for no compensation. That consequence is out of proportion to the accounting error, the unauthorized extension of Stryker's time to respond, agreeing to settle without Ms. Thompson's final consent, or describing of the settlement as "binding."

### 3. Cure

This factor is not relevant to the dispute since Ms. Thompson has largely completed the settlement with Stryker and has no wish to resume her representation by Mr. Watts.

### 4. Good faith and fair dealing by the non-performing party

Despite the mistrust that has developed between the parties, the essential facts show that Mr. Watts represented Ms. Thompson successfully and played an important role in obtaining a settlement figure for her at essentially her "bottom line" position. There is no evidence that the math error, the extension of Stryker's time to respond, the agreement to settle without final consent, or the description of the settlement as "binding" resulted from bad faith or some improper motive.

In considering these factors that govern whether a breach is material, the court concludes that the breaches raised by Ms. Thompson do not excuse her obligation to pay Mr. Watts an hourly fee under the terms of the fee agreement. The basis for this conclusion is that Ms. Thompson was not harmed by the violations. Rather, she benefited from Mr. Watts' representation because she obtained settlement in the amount she had demanded. The ethical violations she identifies are not sufficiently material to justify the forfeiture she seeks.

## Conclusion

The court resolves the fee dispute as follows:

1. Thirty days after the date of this order or earlier by agreement of the parties, Ms. Thompson shall pay Mr. Watts an attorney's fee in the amount of $ 11,235 (hourly charges) and $1,251.56 (expenses), a total of $12,486.56. This amount shall be paid by Stryker from the escrow funds pursuant to the terms of the final settlement agreement between Ms. Thompson and Stryker. (Doc. 97-15, Schedule A.)

2. Fisher & Phillips, LLP as escrow agent is ordered to pay $ 12,486.56 to Mr. Watts in payment of his hourly charges and expenses. Fisher & Phillips shall pay the balance of the escrow funds to Ms. Thompson. The release of these funds to Mr. Watts and to Ms. Thompson fulfills the responsibilities of the escrow agent.

3. This order is stayed in the event of the timely filing of a notice of appeal by any party.

Dated at Burlington, in the District of Vermont, this 2nd day of May, 2025.

/s/ Geoffrey W. Crawford
District Judge
United States District Court